**In re Patrick J. COLLINS, Debtor.**

**No. 99 B 31891.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 19, 2000.

Theodore W. Grippo, Jr., Pembroke & Brown, Park Ridge, IL, for Patrick J. Collins.

Leon E. Lindenbaum, Kurlander & Brisky, Ltd., Chicago, IL, for Lindenbaum Coffman.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the motion of the Society of Lloyd's ("Lloyd's") for sanctions against Patrick J. Collins ("Collins"), a debtor under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (hereinafter the "Bankruptcy Code"), and his attorneys Whitman H. Brisky ("Brisky") and the firm Lindenbaum, Coffman, Kurlander & Brisky (the "Firm"). Following the dismissal of Collins' bankruptcy petition as a bad faith filing under 11 U.S.C. § 707(a), Lloyd's seeks an award of costs and attorneys fees, in the amount of $133,107.09, incurred by it in contesting Collins' bankruptcy case. In addition, Lloyd's seeks amounts equal to those paid to the Chapter 7 trustee (the "Trustee") and the Trustee's counsel, as well as those paid or owing to Brisky and the Firm. Lloyd's argues that by filing for bankruptcy, Collins has depleted the assets available to pay his debt to Lloyd's. Lloyd's moves for sanctions under 11 U.S.C. § 105(a) and under Federal Rule of Bankruptcy Procedure 9011. For the reasons that follow, the Court finds that sanctions should be imposed upon both Collins and his attorneys.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(1) and 28 U.S.C. § 1334. This matter arises

both under title 11 and in a case under title 11. Venue lies under 28 U.S.C. § 1409.

## BACKGROUND

Collins has been a life insurance agent for the past 34 years. He owns and operates his own agency. He has been successful in his business, accumulating assets worth more than $2.3 million.

This case arises entirely out of Collins' relationship with Lloyd's and his attempts to avoid the allegedly unwarranted consequences of that relationship. The many issues between Collins and Lloyd's are not before this Court, and this Court expresses no opinion about the merits of the claims of either side in their ongoing battle. However, that battle is the *raison d'etre* for the bankruptcy case and the many additional months of litigation it has created.

### The Relationship Between Collins and Lloyd's

The Society of Lloyd's operates and regulates Lloyd's of London, the British insurance market that began as a marine insurer over 300 years ago and has now insured everything from Betty Grable's "million dollar legs" to natural disasters and asbestos disease. Unlike traditional American insurance companies, Lloyd's does not directly insure its customers solely with its assets, nor does it earn profits from premiums and pay claims for losses to insureds under its policies. Rather, through individuals known as Members' Agents, Lloyd's solicits individuals of substantial means to become Names or underwriters. Often, these Names form groups known as Syndicates to insure large risks. When an individual becomes a Lloyd's Name, that individual agrees to put his entire net worth at risk to meet the claims that may be made against him or his Syndicate. In exchange, the Names expect to profit from the premiums paid by the policy-holders and from investment of the Syndicate's capital. The obvious hope is that no policy holder will make a claim and

that the Names will reap handsome profits from their investments.

Collins was a Lloyd's Name for the years 1988 through 1991. Collins has testified that he never made any profits on his investment in Lloyd's and that "[a]ll [he] ever did was send them money." (April 11, 2000 11:00 a.m. Transcript at 40:23–24) (hereinafter "Tr. 1"). Collins paid Lloyd's approximately $275,000 in underwriting losses during the years that he was a Name.

These losses resulted from Lloyd's reinsurance of claims such as those for asbestosis, natural disasters, and environmental damage, which may surface, in huge amounts, years after a Syndicate underwrites the policy. *See The Society of Lloyd's v. Ashenden,* No. 98 C 5335, 1999 WL 284775 at *1–4 (N.D.Ill. April 23, 1999) ("*Ashenden II* "); David McClintick, *The Decline and Fall of Lloyd's of London,* Time International, February 21, 2000, at 32 (providing a detailed history of Lloyd's losses since the year 1980 and a description of the problems it and its Names currently face). In 1996, Lloyd's offered its investors a settlement proposal entitled "Reconstruction and Renewal" (the "R & R"). In the R & R, Lloyd's created a reinsurance company known as Equitas to assume responsibility for all pre–1993 liabilities. The Names were required to pay a premium for the Equitas reinsurance. Lloyd's also agreed to settle all outstanding pre–1993 liabilities for a reduced amount if the Names would waive all claims against it. Under English law, Lloyd's was able to accept the R & R on behalf of all the Names concerned and require the Names to pay instantly, even if they intended to sue to reject the R & R. Collins did not consent to the R & R and has not paid the Equitas premium or any other amounts owed to Lloyd's under the R & R. Collins alleges that the Equitas reinsurance is not sufficient to protect him and the other Names from potentially enormous claims arising from pre–1993 lia-

bilities. However, no claims have actually been made.

Collins alleges that Lloyd's fraudulently induced him to become a Name and has attempted to sue Lloyd's or related entities in both the United States and England. The United States District Court for the Northern District of Illinois (the "District Court") dismissed his securities fraud suit for improper venue based on a forum selection clause in his contracts with Lloyd's. *Ashenden et al. v. Lloyd's of London*, No. 96 C 852, 1996 WL 717464 (N.D.Ill. December 9, 1996) (*"Ashenden I "*). An English court awarded Collins approximately £170,000 in suits against two Lloyd's Members Agents, but Lloyd's claimed the money for the benefit of policyholders pursuant to one of its by-laws. Collins has asked that the funds be applied to his debt to Lloyd's, but Lloyd's will not agree to do this. The disposition of the funds is the subject of litigation in England.

Collins is a member of a group that litigates against Lloyd's and related entities. He is also a member of a class action against Lloyd's and related entities including Citibank and the law firms LeBoeuf, Lamb, Greene & McCrae, Mendes & Mount, and Lord, Bissell & Brook. He has testified that other than the lawsuits discussed herein, he individually has no current pending litigation against Lloyd's.

Lloyd's has successfully sued Collins. On March 11, 1998, an English court entered a judgment against him in the amount of £271,856.76 (approximately $433,000) for amounts owed under the R & R (the "English Judgment"). Post-judgment interest has been accruing on the debt, so that it now amounts to approximately $525,000. In order to enforce its judgments, on April 22, 1999, Lloyd's filed for Registrations of Foreign Money Judgments (the "Registrations") in the District Court against Collins and sixteen other American Names against whom English judgments had been entered. Collins and several of his fellow Names attempted to resist the Registrations in *The Society of Lloyd's v. Berkos et al.,* No. 99 C 2651.

On September 16, 1999, United States District Judge Harry D. Leinenweber entered an order setting October 29, 1999 as the ruling date in the *Berkos* case. On October 14, 1999, Collins filed his bankruptcy petition. On October 29, 1999, the District Court entered an order in *Berkos* recognizing the English judgments (the "*Berkos* Judgment"). *Id.* On November 16, 1999, the District Court entered final judgment against twelve other *Berkos* defendants. Those twelve filed a notice of appeal that same day. The appeal is currently pending in the United States Court of Appeals for the Seventh Circuit.

### The Collins Bankruptcy Filing

Collins testified that he first considered a bankruptcy filing following the April 23, 1999 decision in *Ashenden II,* which recognized English judgments against two other Lloyd's Names. Brisky advised him to file the bankruptcy petition either before the District Court announced its judgment in *Berkos* or after any appeal in *Berkos.* He filed just two weeks before the District Court's decision in *Berkos* because he anticipated losing and was anxious to "get it behind him" (Tr. 1 at 38:20) (hereinafter "Tr. 1"), to "end the nightmare" (Tr. 1 at 38:8), to "get finality" (Tr. 1 at 40:1–2), and to "get Lloyd's off his back" (Tr. 1 at 40:7–8). He wanted to "end all of the struggling" (Tr. 1 at 40:2) and to "go on with [his] life" (Tr. 1 at 40:4).

Lloyd's promptly moved to modify the automatic stay imposed by 11 U.S.C. § 362 so that the action in the District Court could proceed against Collins. Collins objected to the Lloyd's motion. On December 21, 1999, the Court modified the stay to allow Lloyd's to proceed in the *Berkos* case for a ruling on any pending motions and any appeal therefrom. The District Court entered judgment against Collins on February 8, 2000. Collins filed his notice of appeal on February 9, 2000.

On December 30, 1999, Lloyd's filed a motion to dismiss Collins' petition as a bad faith filing under 11 U.S.C. § 707(a). After trial on the merits, this Court entered a judgment finding that Collins filed the petition in bad faith and dismissing his case under § 707(a).

On May 4, 2000, following the dismissal of Collins' bankruptcy case, the District Court approved his *supersedeas* bond for the *Berkos* appeal in the amount of $300,000.

*Collins' Debts*

At the time of his bankruptcy filing, Collins had only three creditors: the Harris Bank ("Harris"), the Northern Trust Bank (the "Northern Trust"), and Lloyd's. The debts to Harris and the Northern Trust were each secured. The debt to Harris was secured by a lien on the renewals of life insurance policies sold by Collins; the debt to the Northern Trust was secured by real property. Collins was making timely payments on those debts without difficulty and reaffirmed those debts upon filing his bankruptcy petition. Collins admitted both in his filings with the Court and in his testimony before the Court that he filed this Chapter 7 case solely to free himself of Lloyd's.

The only debt that Lloyd's actively seeks to collect is the English Judgment, which now amounts to approximately $525,000. This debt represents the amount that Lloyd's paid to Equitas on Collins' behalf, plus interest accrued to date. Collins alleges that he may be additionally liable for some unknown amounts at some unknown future time if some unknown potential claimant seeks relief beyond what Equitas can pay. However, Collins has never been asked to pay a penny on any claim of this type and there is no present indication that he will be asked to pay.

In 1992 or 1993, Collins joined the American Names Association (the "ANA"), a group of Lloyd's Names who are also embroiled in litigation with Lloyd's, or at least very unhappy with the outcome of their investments with Lloyd's. The ANA's membership is now made up only of those Names who have refused to accept the R & R. The ANA's original purpose was to gather information about Lloyd's and to develop tactics to defend against Lloyd's. Now, its primary purpose is to "defend its members against attacks by Lloyd's." (Tr. 2 at 17:21–22). The ANA has accumulated and disseminated information on the bankruptcy process to its Names. Collins has been a director of the ANA since 1996.

*Collins' Assets*

At the time of filing, Collins held about $75,000 in non-exempt assets, which became part of the bankruptcy estate. Collins holds approximately $2.3 million in exempt assets such as life insurance policies, pension plans and other retirement plans. He also owns a home in joint tenancy with his wife, which he values at $490,000. This home is the security for the $400,000 debt to the Northern Trust, which Collins has reaffirmed.

Collins testified that he would he would use his exempt assets to pay the debts to Harris and the Northern Trust, stating that "[t]hose are debts I honestly owe and I would see that they are paid." (Tr. 2 at 37:3–4). He testified that using exempt assets to pay Lloyd's would cause him financial distress.

*Collins' Income*

Collins earned net income in excess of $200,000 in the year 1999. He stated in open court that he earned substantially less in 1999 than in prior years, because he was preoccupied with his Lloyd's litigation. He has stated that he will stop working if he does not receive Chapter 7 relief. In addition to income from his business, Collins receives monthly payments from Social Security and several pensions in the approximate total amount of $5,000 to $6,000 per month, all of which is exempt from creditors.

*Collins' Expenses*

Collins has represented to the Court that he spends $975 per month on repairs to his home. He spends $930 per month on food and $800 per month on clothing. For recreation, clubs, and entertainment, he spends $1,780 per month. His total monthly expenses, including other scheduled items, add up to $11,525.65.

Collins pays about $7,500 per year in life insurance premiums that are gifts to his grandchildren. He pays about $30,000 per year in life insurance premiums for himself.

He annually takes his entire family, including his five children, the youngest of whom is thirtyfive, and their spouses and his twenty grandchildren, on vacation. He pays the entire bill. He takes additional vacations with his wife and sometimes includes other family members. He pays the bills for these vacations. Over the past year, these vacations have cost at least $13,000. In October 1999, the same month in which his filed his bankruptcy petition, Collins took a trip to Mexico on which he spent $5,000. Shortly thereafter, and during the pendency of his bankruptcy case, Collins took several members of his family on a ski trip to Snowmass, Colorado. He paid the bill.

Last year, Collins made $30,000 in charitable donations. He expects to make larger donations this year.

He also gives each of his children $1,000 at Christmastime every year. He has stated in his filings and in his testimony before the Court that he seeks Chapter 7 relief so that he will not have to change this lifestyle. He has stated that to him "financial distress" means having to give up these things, which he would rather not do, to pay his bills (April 11, 2000 2:00 p.m.

Transcript at 70:10–13) (hereinafter "Tr. 2"). "Financial distress" to Collins also includes having to use his exempt assets to pay his bills.

*Dismissal as a Bad Faith Filing* [1]

On April 12, 2000, following a two-day trial, this Court dismissed Collins' bankruptcy petition as a bad faith filing under § 707(a) of the Bankruptcy Code based on the foregoing facts. Section 707(a) permits a court to dismiss a case "for cause" after notice and a hearing. 11 U.S.C. § 707(a). Bad faith can constitute cause for dismissal under § 707(a). *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 831 (8th Cir.1994); *Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir.1991); *Industrial Insurance Services v. Zick (In re Zick)*, 931 F.2d 1124, 1126–27 (6th Cir. 1991).

Although the Seventh Circuit has never addressed the issue of dismissal for cause under § 707(a), this Court concluded that the appropriate test for dismissal pursuant to § 707(a) is the "mainstream" totality of the circumstances test employed in other Circuits for dismissal under both § 707(a) and § 707(b). *See Kornfield v. Schwartz (In re Kornfield)*, 164 F.3d 778, 783 (2d Cir.1999) (applying the "mainstream" description to the totality of the circumstances test); *see also, Stewart v. U.S. Trustee (In re Stewart)*, 175 F.3d 796, 810 (10th Cir.1999) (adopting the totality of the circumstances test in which the debtor's ability to pay his debts is the primary factor and other factors should be considered on a case by case basis); *First USA v. Lamanna (In re Lamanna)*, 153 F.3d 1, 4 (1st Cir.1998) (adopting totality of the circumstances as the test by which to determine substantial abuse under § 707(b), but stating that a debtor's ability to pay

1. While this section contains a discussion of the law, it is not to be read as the holding of this opinion. It is merely a recitation of the facts of the hearing on April 11–12, 2000, including the outcome of that hearing, an oral ruling dismissing Collins' case as a bad faith filing followed by the written Judgment Order docketed on April 18, 2000. Collins voluntarily dismissed his appeal of that ruling. The facts recited in this section are necessary to the holding of this opinion-that both Collins and his lawyers should be sanctioned for filing the bankruptcy petition.

may by itself warrant dismissal under the proper circumstances); *Green,* 934 F.2d at 572 (rejecting the *"per se"* rule, which requires dismissal under § 707(b) if a debtor can meet his debts as they come due, and adopting the totality of the circumstances test under which courts evaluate on a case by case basis); *Zick,* 931 F.2d at 1128–30 (approving the bankruptcy court's consideration of multiple factors in dismissing a case under § 707(a) and declaring that courts must undertake bad faith dismissals on an *ad hoc* basis). Most, but not all, of the published opinions discussing the totality of the circumstances test involve motions to dismiss under § 707(b). Lloyd's filed its motion to dismiss Collins' case under § 707(a).

Section 707(b) differs from § 707(a) several respects. First, only the court or the UST may bring motions under § 707(b). Under § 707(b), the debtor's debts must be primarily consumer debts. To dismiss a case under § 707(b), a court must find that granting Chapter 7 relief to the debtor in question would be a substantial abuse of the provisions of Chapter 7. 11 U.S.C. § 707(b). Bad faith is merely one element of substantial abuse under § 707(b). *See, e.g., Lamanna,* 153 F.3d at 1 (rejecting the notion that the term substantial abuse refers only to bad faith acts, although courts should consider bad faith in making a substantial abuse determination). An additional difference between § 707(a) and § 707(b) is that courts may not consider the debtor's contributions to certain religious or charitable organizations under § 707(b). On the other hand, any party in interest may bring a motion under § 707(a) and rather than dismissal for "substantial abuse," § 707(a) permits dismissal for "cause." 11 U.S.C. § 707(a). Section 707(a) does not prohibit consideration of charitable donations. On Lloyd's motion, the Court dismissed Collins' case as a bad faith filing under § 707(a) based on the factors discussed below.

The most important factor of the totality of the circumstances test is whether the debtor has the present ability to pay his debts if he chooses. *Stewart,* 175 F.3d at 810; *Lamanna,* 153 F.3d at 4. In making this determination, it is proper to consider all the debtor's assets, including exempt assets. *Kornfield,* 164 F.3d at 784. "A totality of circumstances inquiry is equitable in nature and the existence of an asset, even if exempt from creditors, is relevant to the debtor's ability to pay his or her debts." *Id.* Clearly, Collins has the ability to pay the only debt remaining after his reaffirmation of the Harris and Northern Trust debts, the $525,000 debt to Lloyd's. He could pay it out of his $2.3 million dollars in life insurance and pension funds. That no court can require him to do so and that he likely never will is beside the point. He can pay if he so chooses.

Collins also has the ability to pay out of future income if he so chooses. Courts should consider the debtor's future income as it relates to his debts and living expenses in determining whether the debtor is abusing the bankruptcy process. *See, e.g., Stewart,* 175 F.3d at 809 (comparing a debtor's monthly earning potential to his debts and living expenses and finding substantial abuse under § 707(b) where the debtor could easily pay his debts out of future income). However, Collins has clearly stated that he will stop working, and thus curtail his income stream to exempt income, if denied bankruptcy relief. He says that he does not want to work as an "indentured servant" to Lloyd's.

The Court also considered whether Collins was merely seeking to gain an advantage over Lloyd's, his only true creditor, by filing his bankruptcy petition. This is an important factor in a totality of circumstances analysis. *Lamanna,* 153 F.3d at 4; *In re Krohn,* 886 F.2d 123, 126 (6th Cir.1989). Whether the debtor has manipulated the bankruptcy process to frustrate one particular creditor is a significant factor in the test under § 707(a). *In re Griffieth,* 209 B.R. 823, 827 (Bankr.N.D.N.Y. 1996). That Collins has so manipulated the process is evident from the facts; be-

cause he reaffirmed his other debts, Lloyd's is his only true creditor. Both the circumstances of the case and Collins' own statements make it manifestly evident that he filed the bankruptcy petition solely and purposely seeking to gain an advantage over Lloyd's.

Another factor is the absence of any attempt to pay creditors. *Id.* Collins has either paid or agreed to pay his other creditors. It was only Lloyd's that he sought to "get off his back."

Finally, the Court considered Collins' unwillingness to make lifestyle changes, such as a cutback in vacations and gifts to his family. There is nothing inherently wrong with these gifts and vacations; on the contrary, Collins' affection for and commitment to his family is both likable and admirable. However, Collins is a debtor in bankruptcy, where a significant factor in a totality of the circumstances analysis is whether the debtor is willing to make lifestyle changes to pay his debts. *Kornfield,* 164 F.3d at 784; *Krohn,* 886 F.2d at 126; *Griffieth,* 209 B.R. at 827. Creditors should not have to bear the burden of a debtor's open-handedness, especially to non-dependent members of his family. Collins, condemning himself out of his own mouth, stated in open court that he filed the bankruptcy petition so that he would not have to change his lifestyle, even temporarily, to pay Lloyd's.

This Court ruled that it "would be an affront to equity and good conscience to allow the debtor to manipulate the system as he seeks to do here." (April 12, 11:00 a.m. Transcript at 28:14–16) (hereinafter "Tr. 3"). The proof was "so overwhelming by the debtor's own filings and testimony to demonstrate his bad faith whether by subjective or objective tests." (Tr. 3 at 29:16–19). Concluding that by filing for bankruptcy, Collins was merely firing one more shot in his battle with Lloyd's, the Court stated that if it were to rule in Collins' favor it "wouldn't be able to face the Chapter 13 debtors who seek to eke out a living with an additional five dollars, or the Chapter 7 debtors who must give up everything in order to continue living on a bare subsistence level." (Tr. 3 at 29:24–25–30:3). The Court entered an order dismissing Collins' case as a bad faith filing, but retained jurisdiction to consider motions for sanctions and trustee's fees. At the request of Brisky and the Firm, the Court agreed to bifurcate the liability issue from the amount and nature of sanctions. Only after a determination of whether Collins, Brisky, or the Firm should be sanctioned would the hearing proceed on the appropriate nature and amounts.

The Court has already entered orders authorizing payment of fees and costs to Kirkland & Ellis, counsel for the Trustee, in the amount of $7,735.44 for fees and costs, and to the Trustee in the amount of $10,046.89 for fees and costs. The Trustee was ordered to return the balance of funds in the estate to Collins. Lloyd's did not object to these payments. Brisky has not submitted a fee application to the Court.

## DISCUSSION

Lloyd's moves for sanctions under 11 U.S.C. § 105(a) and under Federal Rule of Bankruptcy Procedure 9011 based on Collins' initial bad faith filing and subsequent actions that compounded the litigation. It seeks as sanctions all attorneys fees and costs incurred by it during the pendency of Collins' bankruptcy case, in the total amount of $133,107.09. It seeks additional sanctions equal to the amounts the estate paid to the Trustee and his counsel, plus those Collins has paid or will pay to his counsel. Under the protection of the automatic stay imposed by 11 U.S.C. § 362, Collins initiated his appeal of the *Berkos* decision without first paying the judgment or posting a bond; Lloyd's argues that the mere dismissal of his case, without further sanctions, would therefore allow him to partially achieve the objective of his bad faith filing. Although Collins has now posted a $300,000 bond for the *Berkos* appeal, he proceeded for several months,

during the pendency of the bankruptcy, without posting any bond at all.

 A dismissal for bad faith filing does not *per se* require a subsequent imposition of sanctions. *See, e.g., In re Park Place Assocs.*, 118 B.R. 613, 618 (Bankr. N.D.Ill.1990) (explaining that standards for dismissal of a Chapter 11 petition are different than those for imposition of sanctions under Rule 9011). However, a filing made for an improper purpose, such as to harass a creditor, does require sanctions. *Id.* at 616. In this particular case, the facts leading to the dismissal of Collins' case as a bad faith filing all support the findings that Collins: (a) filed the petition for an improper purpose under the provisions of Rule 9011 and (b) attempted to manipulate the bankruptcy process to thwart Lloyd's in violation of § 105(a).

 Although no party effectively addresses this issue, an analysis of whether to impose sanctions under § 105(a) is different than an analysis under Rule 9011. *See, e.g., In re Rimsat, Ltd.*, 212 F.3d 1039, 1048 (7th Cir.2000) (affirming the lower court's decision to sanction under both § 105(a) and Rule 9011, because Rule 9011 could reach only the individual who signed the document in question); *see also, Geraci v. Bryson (In re Bryson)*, 131 F.3d 601, 603 (7th Cir.1997) (explaining that a bankruptcy court's authority to impose sanctions under § 105(a) permits it to punish conduct that Rule 9011 cannot reach); *In re Rainbow Magazine*, 77 F.3d 278, 284–85 (9th Cir.1996) (holding that bankruptcy courts have inherent power under § 105(a) to sanction bad faith or vexatious conduct that does not fall within the purview of Rule 9011). Section 105(a) grants much broader powers and can reach all parties involved, rather than only those who signed or advocated pleadings. *Rimsat*, 212 F.3d at 1048. Bankruptcy courts have both statutory and inherent powers to sanction under § 105(a). *Id.*

 "A sanctioning court should ordinarily rely on available authority conferred by statutes and procedural rules, rather than its inherent power, if the available sources of authority would be adequate to serve the court's purposes." *Id.* However, courts may resort to their inherent powers, rather than specific rules and statutes, where broad authority is necessary to ensure that all culpable parties receive an appropriate sanction. *Id.*

Having said this, the Court will nevertheless first discuss the applicability of both the statutory and inherent powers to sanction granted in § 105(a). A review of Collins' abuse of the bankruptcy process under § 105(a) sheds light on the issue of whether the petition was filed for an improper purpose under Rule 9011.

### Sanctions Under § 105(a)

 Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). "Section 105 grants broad powers to implement the provisions of Title 11 and to prevent an abuse of bankruptcy process." *In re Volpert*, 110 F.3d 494, 500 (7th Cir.1997). The plain language of § 105 empowers bankruptcy courts to sanction conduct that abuses the judicial process and vexatiously multiplies bankruptcy proceedings. *Id.* at 501 (citing with approval and following *Rainbow Magazine*, 77 F.3d 278, in which the Ninth Circuit held that bankruptcy courts have authority under §.105 to impose sanctions for the bad faith filing of a bankruptcy petition). Section 105(a) confers both statutory and inherent authority upon the bankruptcy courts. *Rimsat*, 212 F.3d at 1048. The Court may use its statutory

authority under § 105(a) to sanction Collins, Brisky, and the Firm if it finds that they have abused the judicial process.

When a bankruptcy filing is motivated by a desire to delay a creditor from enforcing its rights in an ongoing dispute, the filing is an abuse of process. *Jones v. Bank of Santa Fe (In re Courtesy Inns)*, 40 F.3d 1084, 1085, 1090 (10th Cir.1994). Section 105(a) empowers bankruptcy courts to punish attorneys who vexatiously multiply the proceedings before them. *Volpert*, 110 F.3d at 500 citing *Courtesy Inns*, 40 F.3d at 1089. Sanctions are justified under § 105(a) where the sanctioning court has clearly found that a litigant "intentionally abused the judicial process in an unreasonable and vexatious manner." *Rimsat*, 212 F.3d at 1047. A case filed for the purpose of delay is also a sanctionable abuse of process. *Hendrix v. Page*, 986 F.2d 195, 201 (7th Cir.1993).

Bankruptcy relief is limited to the honest but unfortunate debtor. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). It is intended to give a fresh start in life to "certain insolvent debtors," *Id.*, so they can "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Id.* quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). It is not intended to allow the clever and determined rich an opportunity to slip away from a single, disfavored creditor.

Collins and his attorneys admittedly filed the Chapter 7 petition solely to thwart Lloyd's. In the Joint Pre–Trial Order, Collins' proposed several findings of fact to this effect, including:

(42) [Collins] filed this case in order to obtain relief from, and a discharge with respect to his liability to Lloyds [sic].

(43) [Collins] also filed this case in order to attempt to obtain finality with respect to his continuing liability to Lloyds [sic] policyholders.[2]

(44) [Collins] also filed this case in order to protect his exempt assets and to obtain a fresh start free of his involvement with Lloyds [sic].

(Joint Pretrial Order at p. 16). Even now that the Court has held that such purposes were a manipulation of the bankruptcy system "purely and admittedly for the purpose of frustrating Lloyd's while honoring and respecting his other debts," (Tr. 3 at 29:6–9), Collins, Brisky and the Firm continue to argue that Collins justifiably filed the petition to "discharge Lloyd's ... claims against him at the cost of receiving such relief, to wit, financial disclosure, cooperation with the Trustee and surrender of his ... non-exempt assets. Morever, as [Collins] testified, he wanted to terminate his litigation with Lloyd's rather than continue it." (Memorandum of Debtor's Counsel in Opposition to Lloyds' [sic] Petition for Award of Sanctions at p. 8–9). There is no possible conclusion to draw from these arguments but that, having lost on the merits in almost every available forum, Collins and his attorneys resorted to bankruptcy simply to bring the ongoing litigation to a crashing halt. Because almost all of Collins' millions of dollars are exempt assets, they knew that bankruptcy relief would cost Collins comparatively little, $75,000, as opposed to payment of the $525,000 *Berkos* judgment. This is not just a litigation tactic, but an inequitable attempt at litigation derailment. Collins' bankruptcy filing was both unreasonable and vexatious.

Collins was neither insolvent nor in financial distress. Collins did not file his Chapter 7 petition to discharge debts he could not pay. He filed to stick it to

---

2. The Court found, and Collins conceded, that none of these policyholders have made any claims against Collins. The Court further found, and Collins conceded, that the only debt that Lloyd's is seeking to collect is the *Berkos* Judgment.

Lloyd's. First, he is perfectly able to pay the $525,000 debt to Lloyd's and still have at least $1.8 million left in assets, not to mention his handsome income. Secondly, and more importantly, even if successful, the bankruptcy filing would not have made any changes in his financial situation. Before the bankruptcy filing, Lloyd's was unable to reach Collins' millions in exempt assets. During the pendency of the case, Lloyd's was unable to reach Collins' millions in exempt assets. Now that the case has been dismissed, Lloyd's is unable to reach Collins' millions in exempt assets. Before the case was filed, Collins had $75,000 in non-exempt assets that Lloyd's could reach. During the pendency of the case, the bankruptcy estate had possession of that $75,000, which would have gone to pay Lloyd's after the payment of administrative expenses such as fees for the Trustee and his counsel. Now that the case has been dismissed, the $75,000 has been returned to Collins, less administrative expenses of about $18,000, and Lloyd's can still reach it. All that has really happened as a result of the bankruptcy filing is that Collins now has only about $57,000 in non-exempt assets, instead of $75,000. Never at any time, before, during, or after the filing, was Lloyd's going to be able to reach more than Collins' few exempt assets. Collins has acknowledged that he and his attorneys knew this to be true, stating that "if this bankruptcy is dismissed, Lloyds [sic] would be able, at best, to receive [Collins] non-exempt assets only, something it could do in this case." (Memorandum in Opposition to Lloyds' [sic] Motion to Dismiss at p. 6).

Collins filed the Chapter 7 petition because after making a losing investment, and litigating over it on two continents for several years, both as plaintiff and defendant, he wanted to take his marbles and go home before the game was over. He didn't want to play anymore and he tried to use the bankruptcy system first to compound the proceedings and then to call the game. He made a unilateral decision to settle with Lloyd's for $75,000 and attempted to cram it down Lloyd's throat using the bankruptcy system.

Further, as discussed in the following section on Rule 9011, Collins, Brisky, and the Firm proceeded with the bankruptcy although they knew or should have known that the case was likely, although not certain, to be dismissed as a bad faith filing.

The Collins filing was clearly an abuse of the bankruptcy process and the judicial system. It has clogged the dockets of two federal courts and has caused Lloyd's to expend substantial time and effort to resist it. Collins tries to characterize this motion for sanctions in the following ways: "Since he lost the case, let him also be sanctioned for ever having brought it," or "Since he defied Lloyd's, let him be destroyed." (Memorandum in Support of Debtor Patrick Collins in Opposition to Lloyd's Petition for Sanctions p. 1). It is true that Collins will be sanctioned for having brought the case, but sanctions will not be imposed because he lost. They will be imposed because he never should have brought the case in the first place. Nor will sanctions be imposed to destroy him for defying Lloyd's. It is neither the policy nor the practice of this Court to destroy litigants for properly opposing their adversaries. Sanctions will be imposed to punish Collins and his attorneys for intentionally abusing the judicial process in an unreasonable and vexatious manner.

*Standards for Measuring Sanctions Under § 105(a)*

Sanctions under § 105(a) may be used to punish litigants and attorneys. *Rimsat,* 212 F.3d at 1048; *Volpert,* 110 F.3d at 500. However, sanctions for abuse of process should be narrowly tailored to the abuse. *Support Systems Int'l, Inc. v. Mack,* 45 F.3d 185, 186 (7th cir.1995). Section 105(a) grants statutory authority to impose "necessary and appropriate" sanctions for an abuse of process. 11 U.S.C. § 105(a).

Having determined that sanctions for abuse of process under § 105(a) should be

imposed on Collins and his attorneys, the Court allows the parties the opportunity to present arguments as to the sanctions necessary and appropriate to punish and prevent an abuse of process, pursuant to the standards set forth above.

**Sanctions Under Rule 9011**

■ Federal Rule of Bankruptcy Procedure 9011 requires that almost every paper presented to the court be signed by an attorney of record or *pro se* litigant. Fed. R. Bankr.P. 9011(a). It further provides in pertinent part:

(b) Representations to the court

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law . . . .

Fed. R. Bankr.P. 9011(b). Rule 9011(c) authorizes the bankruptcy courts to impose sanctions for violations of Rule 9011(b):

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

Fed. R. Bankr.P. 9011(c). Sanctions shall be limited to what is sufficient to deter the conduct complained of. Fed. R. Bankr.P.

9011(c)(2). Sanctions may be nonmonetary or may include payment of some or all of the reasonable attorneys fees incurred as a result of the violation. Fed. R. Bankr.P. 9011(c)(2).

■ Rule 9011 is "essentially identical" to Federal Rule of Civil Procedure 11. *Park Place,* 118 B.R. at 616. Rule 11 precedents may be applied to make decisions under Rule 9011. *H.J. Rowe, Inc. v. Spiegel, Inc. (In re Talon Holdings, Inc.),* Nos. 97 B 37535, 99 A 01815, 1999 WL 150337 at * 3 (Bankr.N.D.Ill. March 19, 1999); *Park Place,* 118 B.R. at 616. Rule 11 was amended in 1993 and Rule 9011 was amended in 1997 to add a "safe harbor" clause allowing a movant to withdraw an objectionable pleading. Rule 9011 was amended so that it would conform to Rule 11. Fed. R. Bankr.P. 9011 advisory committee's note (1997). The amendments were procedural and not substantive, so pre-amendment cases under either rule are still applicable today. *Talon,* 1999 WL 150337 at *3.

■ Rule 9011 expressly excludes the filing of a bankruptcy petition from the safe harbor provision. Fed. R. Bankr.P. 9011(c)(1)(A). The Rule excludes the initial filing because "[t]he filing of a petition has immediate serious consequences, including the imposition of the automatic stay under § 362 of the Code, which may not be avoided by the subsequent withdrawal of the petition." *Id.*

*Whether the Provisions of Rule 9011 Apply to Collins*

■ Although none of the parties has raised the question, the first issue to be determined is whether Rule 9011 applies only to Brisky and the Firm, or to Collins as well. Collins signed his bankruptcy petition; however, Rule 9011(b) plainly states that by presenting it to the court, "attorneys or unrepresented parties" certify that a paper meets the requirements of Rule 9011. Fed. R. Bankr.P. 9011(b).

Collins is neither an attorney nor an unrepresented party.

Before the 1993 amendments to Rule 11, the Rule applied to represented parties. *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 544–45, 111 S.Ct. 922, 929–30, 112 L.Ed.2d 1140 (1991). However, before the 1993 amendments, Rule 11 provided that the "signature of an attorney or party constitutes a certificate . . ." that the paper conforms to the Rule's requirements. Fed.R.Civ.P. 11 (1993) (amended 1993). The word "party" in Rule 11 has now been changed to the words "unrepresented party." Fed.R.Civ.P. 11(b). In *Business Guides*, the Supreme Court held that the only way that a represented party who signed a paper could avoid having to satisfy the certification requirement was by reading the words "attorney or party" to mean "attorney or unrepresented party." 498 U.S. at 544–45, 111 S.Ct. at 929. Then, the signature of an unrepresented party would "fall outside the scope of the Rule." *Id.* "Attorney or unrepresented party" is precisely what the Rule now says. Fed.R.Civ.P. 11(b). Given the change in language following *Business Guides*, it seems clear that under the present Rule 11, only attorneys or unrepresented parties make a certification that the papers meet the Rule's requirements.

Since the Rule requires a certification, it is a false certification that violates it. The question then becomes whether a represented party can be sanctioned if Rule 11(b) has been violated, even though a represented party does not make a certification under Rule 11(b).

Rule 11(c) provides that two groups may be sanctioned if Rule 11(b) has been violated. Fed.R.Civ.P. 11(c). The first is the attorneys, laws firms, or parties that have actually violated the Rule. *Id.* The second group is those attorneys, law firms, or parties who are responsible for the violation. *Id.*

> The sanction should be imposed upon the persons-whether attorneys, law firms, or parties-who have violated the rule or who may be determined to be responsible for the violation. The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be held responsible for the violation.
>
> . . . .
>
> The revision permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing a violation. When appropriate, the court can make an additional inquiry to determine whether the sanction should be imposed on such persons, firms, or parties either in addition to or, in unusual circumstances, instead of the person actually making the presentation to the court.

Fed.R.Civ.P. 11 advisory committee note (1993). Collins has not actually violated Rule 11(b), because according to its plain language, he has made no certification. He was not the person actually making the presentation to the court; Brisky was. Therefore, Collins is not a member of the first group. However, the petition was filed on his behalf and under his direction for the sole purpose of using the bankruptcy system to remain a wealthy man while frustrating Lloyd's. Rule 9011, unlike Rule 11, accords special treatment to a bankruptcy petition because of the instant and substantial advantage the filer gains and the instant and substantial disadvantage his creditors suffer. Furthermore, "experience has shown that bankruptcy proceedings are subject to a degree of manipulation and abuse not typical of civil litigation." *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 830 (9th Cir.1994). Under these circumstances, it is appropriate to hold Collins accountable for his part in causing the violation. He is a member of the second group-those responsible for causing a violation.

The application of Rule 9011 to Collins is further supported by the Rule's provision that monetary sanctions may not be awarded against a represented party for a violation of the requirement that the claims are warranted by existing law. Fed.R.Civ.P. 11(c)(2)(A). The limiting precision which solely addresses this provision reflects that monetary sanctions may be imposed on represented parties for violations of the other sections of Rule 9011(b).

*The Purpose and Structure of Rules 11 and 9011*

> Rule 11 creates duties to one's adversary and to the legal system, just as tort law creates duties to one's client. The duty to one's adversary is to avoid needless legal costs and delay. The duty to the legal system (that is, to litigants in other cases) is to avoid clogging the courts with paper that wastes judicial time and thus defers the disposition of other cases or, by leaving judges less time to resolve each case, increases the rate of error. Rule 11 allows judges to husband their scarce energy for the claims of litigants with serious disputes needing resolution.

*Mars Steel Corp. v. Continental Bank, N.A.,* 880 F.2d 928, 932 (7th Cir.1989). Rule 11 has both a subjective and an objective component. *Harlyn Sales Corp. Profit Sharing Plan v. Kemper Financial Services, Inc.,* 9 F.3d 1263, 1269 (7th Cir.1993); *Mars Steel,* 880 F.2d at 931, *Slaughter v. Waubonsee Community College,* No. 94 C 2525, 1995 WL 106420 at *3 (N.D.Ill. March 9, 1995). So does Rule 9011. *In re Val W. Poterek & Sons, Inc.,* 169 B.R. 896, 908 (Bankr.N.D.Ill. 1994); *Park Place,* 118 B.R. at 617. The objective inquiry asks whether the suit was filed after reasonable investigation into the law and the facts. *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1083 (7th Cir.1987). The subjective inquiry is into why the petitioner pursued the litigation. *Id.* The objective component is equivalent to the tort of abuse of process (filing an objectively frivolous suit). *Id.* The subjective component is akin to the tort of malicious prosecution (filing a colorable suit to harass, delay, or cause expense to the opponent). *Kapco Mfg. Co., Inc. v. C & O Enter., Inc.,* 886 F.2d 1485, 1491 (7th Cir.1989); *Szabo,* 823 F.2d at 1083; *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir.1985). The objective inquiry asks whether the requirement of Rule 11(b)(2), that the legal contentions are supported by law, has been satisfied. The subjective inquiry asks whether the requirement of Rule 11(b)(1), that the paper has not been presented for an improper purpose, has been met. Failure to satisfy the requirements of either test may result in sanctions. *Szabo,* 823 F.2d at 1083; *see also Beeman v. Fiester,* 852 F.2d 206, 209 (7th Cir.1988) (explaining that if any one of Rule 11(b)'s subsections has been violated, Rule 11 sanctions may be imposed).

Brisky and the Firm claim that only an objective test is proper and cite *In re Rainbow Magazine, Inc.,* 136 B.R. 545 (9th Cir. BAP 1992) *appeal after remand* 77 F.3d 278 (9th Cir.1996), a Ninth Circuit Bankruptcy Appellate Panel case that the Ninth Circuit Bankruptcy Appellate Panel itself has since stated is "no longer good law." *Franchise Tax Board v. Lapin (In re Lapin),* 226 B.R. 637, 641 (9th Cir. BAP 1998). They do not cite any Seventh Circuit authority in support of their claim.

 There are a few Seventh Circuit cases that place an "objective" label on the test to determine whether a paper was interposed for an improper purpose. *Pacific Dunlop Holdings, Inc. v. Barosh,* 22 F.3d 113, 118 (7th Cir.1994); *Deere & Co. v. Deutsche Lufthansa Aktiengesellschaft,* 855 F.2d 385, 393 (7th Cir.1988). However, whether the test bears the "subjective" label affixed in *Mars Steel* or the "objective" label of *Pacific Dunlop,* the inquiry is into the motivations behind the filing. *Pacific Dunlop* briefly states that "[w]e determine whether a party's conduct was imposed for an improper purpose by an

objective standard," 22 F.3d at 118, and cites to *Deere,* 855 F.2d at 393. In *Deere,* the court said that it must "focus on objectively ascertainable circumstances that support an inference that a filing harassed the defendant or caused unnecessary delay." *Deere,* 855 F.2d at 393 quoting *National Ass'n of Gov't Employees, Inc. v. National Fed'n of Federal Employees,* 844 F.2d 216, 224 (5th Cir.1988). The *Deere* court relied on *Beeman v. Fiester,* 852 F.2d 206, 209–10 (7th Cir.1988), *abrogated by Mars Steel,* 880 F.2d at 928. In *Beeman,* the court wrote that an objective test for improper purpose "necessarily requires an inquiry into the party's reasons for filing the paper" and places an emphasis on "the party's motives for filing the paper." 852 F.2d at 209. The *Beeman* court further explained that the subjective test becomes particularly important when the suit is objectively colorable. *Id.* at 209 n. 1. Thus, no matter which label attaches to the test, "subjective" or "objective," the test of whether a paper was interposed for an improper purpose focuses on the reasons or motives for the filing. For purposes of discussion, the Court will use the "subjective" label.

▆▆▆▆ "For sanction purposes the focus is on what the party intended and what that party knew or should have known on the day the paper was filed." *Park Place,* 118 B.R. at 617. Applying the objective test, the Court must consider whether Collins or Brisky and the Firm made an inquiry, reasonable under the circumstances, into both the facts of the case and the law affecting them before filing the petition. *Mars Steel,* 880 F.2d at 932; *Park Place,* 118 B.R. at 617. Applying the subjective test, the Court must determine what motivated the filing. *Mars Steel,* 880 F.2d at 932; *Park Place,* 118 B.R. at 617. It must examine the "subjective 'belief' and 'purpose,'" *Harlyn,* 9 F.3d at 1269, of the attorney signing the pleading and consider whether the attorney who signed the pleading "subjectively believed that what is stated in that pleading

'is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law and that it is not interposed from any improper purpose....'" *Id.* Alternatively, or additionally, under the objective test for improper purpose of *Pacific Dunlop,* the Court must look at objectively ascertainable circumstances that support an inference that Collins' actions harassed Lloyd's or caused unnecessary delay.

*The Subjective Test: Improper Purpose Under Rule 9011(b)(1)*

▆▆▆ A signature on a paper presented to the court is a certification that the paper has not been presented for any improper purpose, such as harassment or delay. Fed. R. Bankr.P. 9011(b)(1). This question requires a "fact-specific" inquiry. *Park Place,* 118 B.R. at 619.

Collins has unequivocally stated that he filed the petition for the sole purpose of getting rid of Lloyd's. Is the purpose of shedding a single creditor with whom one has been embroiled in years of litigation, in which one is presently losing, and in which one expects ultimately to lose, and whom one has the ability, if not the desire, to pay, an improper purpose? Is the purpose of delaying entry of judgment in the District Court and then appealing that judgment without posting a *supersedeas* bond an improper purpose?

There is no doubt that the bankruptcy created, and was intended to create, delay in the ongoing Collins–Lloyd's litigation. One of the instant, primary effects of filing is to invoke the protections of the automatic stay. 11 U.S.C. § 362. Thus, the District Court was unable to enter judgment against Collins at the same time it entered judgment against the other *Berkos* defendants. Lloyd's was forced to bring a motion in this Court seeking modification of the stay before judgment could be entered. Further, Collins was able to proceed with his appeal of that decision without giving Lloyd's the assurance of a *supersedeas* bond.

Where the debtor filed a Chapter 11 petition to delay collection of a state court judgment and avoid posting an appeal bond, both of which she was able to pay, the Ninth Circuit found that her action was sanctionable as "a transparent attempt to use a Chapter 11 petition and the resulting stay as an inexpensive substitute for the bond required under state law." *Marsch,* 36 F.3d at 831. Where a plaintiff filed a second complaint to avoid anticipated denial of a motion to reconsider his first, the proceedings "prolonged the litigation and constituted a war upon the defendants which [plaintiffs] sought to expand on as many fronts as possible." *Kapco,* 886 F.2d at 1492. Sanctions were justifiable for actions that unnecessarily prolonged litigation for the purposes of harassment. *Id.* A petition filed as a litigation tactic where the debtor had only one creditor, its available assets could be liquidated outside bankruptcy, and where the bankruptcy filing delayed completion of nonbankruptcy litigation was sanctionable "[g]iven the timing of the bankruptcy, its delay of state court action, and absence of anything to reorganize." *St. Paul Self Storage Ltd. Partnership v. Port Authority of City of St. Paul (In re St. Paul Self Storage Ltd. Partnership),* 185 B.R. 580, 584 (1995). Where a Chapter 7 petition served no bankruptcy purpose because the debtor's available assets could be distributed without bankruptcy administration and the filing benefitted only the debtor's principals, the principals were sanctioned for filing to hinder, delay, and frustrate the creditor and further their own interests. *Trizec Colony Square, Inc. v. Gaslowitz (In re Addon Corp.),* 231 B.R. 385, 390 (Bankr.N.D.Ga.1999).

 On the other hand, the provisions of the automatic stay exist for, and were expressly created for, all those who file bankruptcy. The provisions exist for the sole purpose of delaying collection proceedings against those debtors. "It is axiomatic that a primary purpose of the automatic stay is to give the debtor some 'breathing room.'" *Park Place,* 118 B.R. at 617. Therefore, the mere fact that Collins achieved the protection of the automatic stay does not mean that he filed for an improper purpose.

 However, Collins did not merely invoke the shield of the automatic stay; he converted it to a sword for the sole purpose of frustrating a single creditor whom he is able, but unwilling to pay. Furthermore, he attempted to use the bankruptcy system, including this Court, to delay judgment, avoid the *supersedeas* bond, and ultimately to force Lloyd's to accept the amount, consisting of his relatively insignificant non-exempt assets less bankruptcy expenses, that he, and he alone, had determined should end the years of litigation. He attempted to use the bankruptcy system, backed by his threat to stop working if he did not receive a discharge, to impose his unilaterally-decided settlement amount on his objecting opponent. Such a purpose is improper under Rule 9011.

The Third Circuit Court of Appeals has found that a Chapter 11 petition filed under similar circumstances was filed for an improper purpose. The debtor and creditor had been "bickering and squabbling for years in the state courts." *Cinema Service Corp. v. Edbee Corp.,* 774 F.2d 584, 586 (3d Cir.1985). The court found that the debtor's filing on the eve of a foreclosure sale "was precipitated, not by a desire, or need for reorganization, but simply to stave off a sheriff's sale on Cinema's state court judgment." *Id.; see also, Wright v. Tackett,* 39 F.3d 155, 158 (7th Cir.1994) (affirming Rule 11 sanctions against a litigant who filed federal pleadings in a bad faith attempt to delay and disrupt state court proceedings). Commenting that the same considerations apply in a case under Chapter 7, the court held that the petition was filed for an improper purpose because the existing and threatened claims did not constitute an "actual, substantial danger to the economic viability" of the debtor. *Cinema Service,* 774 F.2d at 586.

Collins and Lloyd's have been bickering and squabbling for years in courts around the world. Collins filed his petition on the eve of judgment in the *Berkos* case, on Brisky's advice, precipitated, not by a need or desire for reorganization, but simply to stave off entry and enforcement of the *Berkos* Judgment. Lloyd's existing and threatened claims did not constitute an actual, substantial danger to Collins' economic viability; he is able to pay them, but does not want to. While there is probably nobody who would wish to part with roughly 20% of his net worth to pay an entity he loathes, it does not change the fact Collins still would be a man of substantial means if he paid Lloyd's the *Berkos* Judgment. The Court finds that Collins and Brisky and the Firm filed the Chapter 7 petition, not to obtain relief for an honest but unfortunate debtor, but as a cutthroat litigation tactic intended to delay and frustrate Lloyd's in the course of litigation that both parties have pursued for years. Furthermore, they attempted to use the bankruptcy system to bring an abrupt and favorable end to the litigation after forming the belief that Collins was going to lose on the merits. This is an improper purpose under Rule 9011.

Thus, under the subjective test, Collins and Brisky and the Firm breached their duty to Lloyd's, to this Court, and to the District Court. The bankruptcy filing caused needless expense and delay, not only in this Court, but in the District Court. It clogged the District Court by delaying entry of judgment against Collins together with the other *Berkos* defendants. It clogged this Court with a docket that includes 137 entries, accumulated between October 14, 1999 and June 13, 2000. The petition was meritless, as evidenced by the Court's findings of fact and conclusions of law in dismissing it as a bad faith filing. Sanctions should thus be imposed on Collins and Brisky and the Firm under Rule 9011 because their actions fail the subjective test under Rule 9011.

The Collins filing also fails the objective test for improper purpose set forth in *Deere* and adopted by *Harlyn*. A focus on objectively ascertainable circumstances supports an inference that the filing harassed Lloyd's and caused unnecessary delay. Lloyd's was Collins' only true creditor. Collins and Lloyd's had been at each other's throats for years. Collins expected an unfavorable decision in *Berkos* and, on the advice of counsel, filed his bankruptcy petition two weeks before judgment was entered. Collins immediately reaffirmed his two other debts while attempting to discharge the entirety of his Lloyd's debt. Collins had nothing to reorganize; most of his assets are exempt and those that are non-exempt would have been available to pay Lloyd's outside of bankruptcy. Collins is not in financial distress; he is a wealthy man. Collins has made no effort to pay Lloyd's; he has done everything in his power not to pay Lloyd's. He has threatened even to extinguish his non-exempt income stream rather than see any of it go to Lloyd's. These, and all other facts considered in dismissing Collins' case, are objectively ascertainable and support not only an inference, but an inescapable conclusion, that Collins' scorched-earth filing harassed Lloyd's and caused unnecessary delay.

*The Objective Test: Warranted by Existing Law Under Rule 9011(b)(2)*

An attorney or party filing papers or advocating a cause must make a reasonable investigation into the facts of the case and into the law as applied to them. Fed. R. Bankr.P. 9011. The signature on the paper is a certification that the legal contentions therein are warranted by existing law or a nonfrivolous argument for a change in the law. Fed.R.Civ.P. 9011(b)(2).

The facts, as they relate to Collins' bankruptcy filing, are uncontested. Therefore, whether Collins, Brisky, and the Firm made a reasonable inquiry into the facts is not at issue here.

The troubling question is whether Collins[3] and Brisky and the Firm made a reasonable inquiry into the state of existing law and believed that Collins' bankruptcy was supported by it. If a position is not warranted by existing law or a good faith argument for a change in the law, it is frivolous from an objective point of view. *Szabo,* 823 F.2d at 1082. Did Collins and Brisky and the Firm know, or should they have known, that the petition of this liquidating debtor, who was timely paying his debts; whose net worth exceeds $2.3 million, most of which is exempt from creditors; whose annual income exceeds $200,000; whose monthly living expenses exceed $11,000; who is unwilling to change his lifestyle to pay his debts; and who admittedly sought to escape a single creditor whom he had the ability to pay, was unsupported and unjustified under existing law?

Not all unsuccessful arguments are frivolous. For an argument to be considered frivolous, "it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Mareno v. Rowe,* 910 F.2d 1043, 1047 (2d Cir.1990). However, sanctions should not have the effect of chilling creativity or stifling zealous advocacy. *LaSalle Nat'l Bank of Chicago v. County of DuPage,* 10 F.3d 1333, 1338 (7th Cir. 1993). Collins has not argued that existing law should be changed; therefore the Court must consider whether it was clear under existing law that Collins had no chance of success.

Collins, Brisky, and the Firm argue that it was not clear at all. In support of their argument, they state: (1) that as noted above, the Seventh Circuit has never considered a dismissal under either § 707(b) or § 707(a) and therefore has not adopted the totality of the circumstances test; (2) that the cases holding that exempt assets should be considered in determining ability to pay have all been decided under § 707(b); and (3) that other Lloyd's Names have successfully discharged their debts in bankruptcy in this District.

The Court dismisses the third contention out of hand. As Collins and Brisky and the Firm have repeatedly urged in this case, the question of a debtor's good faith in filing must be decided on an *ad hoc* basis. *Zick,* 931 F.2d at 1129. Thus, whether other debtors, who also happened to be Lloyd's Names, received discharges is not relevant to this inquiry. The circumstances of those discharges may have been entirely different from those now before the Court.[4]

As to the first contention, the Court concludes that Collins, Brisky, and the Firm should have been virtually certain from existing case law that the Court would apply the totality of the circumstances test. Although the Seventh Circuit has not addressed the question, the totality of the circumstances test has been widely adopted and is the law in many circuits. *See Kornfield,* 164 F.3d at 783 (referring to the totality of circumstances test as "mainstream"). A litigant may not adopt the "ostrich-like tactic of pretending that potentially dispositive authority against [his] contention does not exist." *Szabo,* 823 F.2d at 1081 quoting *Hill v. Norfolk & Western Ry.,* 814 F.2d 1192, 1198 (7th Cir.1987); *see also, Marsch,* 36 F.3d at 830 (determining that a petition was of dubious legal merit because the debtor's argument was flatly contradicted by the overwhelming weight of authority in districts where the issue had been decided). When a litigant relies on obscure, discredited cases without acknowledging

---

**3.** Although Rule 11 does not permit monetary sanctions against a represented party for violation of this requirement, nonmonetary sanctions may be imposed against him.

**4.** The Court takes judicial notice of the fact that the circumstances of the cases to which Brisky and the Firm refer are in fact different in at least one important respect: Lloyd's did not file motions to dismiss those cases.

the force of existing law, the argument is frivolous on an objective standard. *Szabo,* 823 F.2d at 1082.

Collins did not acknowledge the force of existing law. With only one exception, he failed to cite any of the cases on which the Court relied in dismissing his case. Collins grudgingly discussed *Zick* in his brief, but only in resistance to the reliance Lloyd's placed on it.

Collins, Brisky, and the Firm instead tried to persuade the Court to follow the obscure, minority holdings of two bankruptcy courts that have determined no good faith filing requirement exists under § 707(a). *In re Landes,* 195 B.R. 855, 860–61 (Bankr.E.D.Pa.1996) citing *Sinkow v. Latimer (In re Latimer),* 82 B.R. 354, 356 (holding that good faith is not a requirement of § 707(a) and that "cause" in § 707(a) means violation of a court order); *see also, In re Etcheverry,* 221 B.R. 524, 525 (Bankr.D.Colo.1998) (adopting the holding of *Latimer* and *Landes*) aff'd 242 B.R. 503 (D.Colo.1999). Not only are these cases obscure, but they have been largely discredited. While *Landes* and *Latimer* have not actually been overruled, the Court notes that the United States District Court for the District of Eastern Pennsylvania, which sits in review over the *Landes* and *Latimer* court, has held that a good faith filing requirement does exist under § 707(a), *In re Marks,* 174 B.R. 37, 40 (E.D.Pa.1994) and has expressly rejected *Latimer. Id.* at 40 n. 3. In addition, although the Tenth Circuit, of which the District of Colorado is a part, has not applied the totality of circumstances test to a case under § 707(a), it has held that the test is proper for a case under § 707(b). *Stewart,* 175 F.3d at 810. Ostrich-like, Collins and his counsel pretended that these cases did not exist; they failed to bring them to the Court's attention. Under these circumstances, it is appropriate to conclude that they "either are trying to buffalo the court or have not done their homework." *Szabo,* 823 F.2d at 1082.

Relying on summaries provided in *Landes,* Collins, Brisky, and the Firm additionally tried to persuade the Court to adopt what the *Landes* court characterized as the "frustrate the bankruptcy purpose" test. This test asks whether "the debtor is in bankruptcy with an intent to receive the sort of relief that Congress made available to petitioners under the chapter in question—subject, of course, to any statutory limitations on the extent of that relief—and is willing to responsibly carry out the duties that Congress imposes on debtors as the cost of receiving such relief." *In re Khan,* 172 B.R. 613, (Bankr.D.Minn.1994). Under this test, bad faith may be evidenced by "vindictive motivation to use bankruptcy solely as a 'scorched-earth' tactic against a pressing creditor or opponent in litigation." *Id.* Filing a bankruptcy petition to frustrate a state court decree and defeat one creditor's rights, while manipulating earnings to achieve these purposes satisfies the *Khan* test. *In re Huckfeldt,* 39 F.3d 829, 832–33 (8th Cir.1994). The debtor under this test must still be an "honest but unfortunate debtor" and not a manipulator. *Id.* at 833. Thus, even under *Khan's* narrow standard, the Court would have dismissed Collins' petition "for cause."

 Collins' second contention is that the cases considering the debtor's exempt assets in determining good faith all arise under § 707(b) or under 11 U.S.C. § 1325. However, the "substantial abuse" standard of § 707(b) is more stringent than the "for cause" standard of § 707(a). The debtor's good faith is merely one element of a substantial abuse analysis, while it may by itself constitute cause under § 707(a). Furthermore, Collins resorted once again to ostrich-like tactics and failed to discuss or even cite any of the § 707(b) or § 1325 cases.

This Court is well aware of its responsibility to carefully avoid penalizing arguments for legal evolution. Had Collins discussed any of the law unfavorable to his position; had he mentioned and refuted

any of the unfavorable material in the cases such as *Khan* and *Huckfeldt,* to which he did cite; had he made any attempt to distinguish § 707(a) from § 707(b), it might have been possible to conclude that he was making a good faith argument for change in or extension of the law. However, he did none of these things, but left the Court and Lloyd's to do all that research. Such foisting of the burden onto the Court or one's opponent is precisely what Rules 11 and 9011 were created to prevent. *Mars Steel,* 880 F.2d at 932.

*Standards for Measuring Sanctions Under Rule 9011*

 "Rule 11 is not a fee-shifting statute in the sense that the loser pays. It is a law imposing sanctions if counsel files with improper motives or inadequate investigation." *Id.* Rule 9011(c)(1)(A) limits the amount of sanctions to "the reasonable expenses and attorney's fees incurred in presenting or opposing the motion," Fed. R. Bankr.P 9011(c)(1)(A), but does not require that the court impose sanctions up to the limit. The purpose of both Rule 11 and Rule 9011 is deterrence. A sanction under Rule 11 should be the least severe that is adequate for deterrence. *Divane v. Krull Electric Co., Inc.,* 200 F.3d 1020, 1030 (7th Cir.1999).

## CONCLUSION

For the foregoing reasons, sanctions of a nature and amount yet to be determined will be imposed on Collins, Brisky and the Firm for violation of the provisions of § 105(a) and Rule 9011.